Jessica N. Walker (State Bar No. 275398)
jwalker@nixonpeabody.com
**NIXON PEABODY LLP**
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Tel: (213) 629-6000
Fax (855) 780-9262

Jonathan Sablone
jsablone@nixonpeabody.com
Kacey Houston Walker
kwalker@nixonpeabody.com
**NIXON PEABODY LLP**
100 Summer Street
Boston, MA  02110-2131
Tel: (617) 345-1342
Fax: (866) 947-1729
*Pro Hac Vice Applications Forthcoming*

Attorneys for Plaintiff Ninespot, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| NINESPOT, INC.,<br><br>                    Plaintiff,<br><br>        vs.<br><br>JUPAI HOLDINGS LIMITED, PUJI MEDIA HOLDINGS LIMITED 普及传媒控股有限公司, and PUJI JUPAI ASSET MANAGEMENT,<br><br>                    Defendants. | Case No. 8:17-cv-01719<br><br>**COMPLAINT FOR BREACH OF CONTRACT; BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS; BREACH OF FIDUCIARY DUTY; INTENTIONAL MISREPRESENTATION; AND VIOLATION OF THE DELAWARE DECEPTIVE TRADE PRACTICES ACT, AND DEMAND FOR JURY TRIAL** |

4822-5562-5039.7

**COMPLAINT**

Pursuant to the Federal Rules of Civil Procedure, Plaintiff Ninespot, Inc., hereby alleges as follows:

**INTRODUCTION**

1.      Plaintiff Ninespot, Inc. ("Ninespot" or the "Company") brings this action against Defendants Jupai Holdings Limited ("Jupai"), Puji Media Holdings Limited 普及传媒控股有限公司 ("Puji"), and Puji Jupai Asset Management ("Puji Jupai") to recover for their breaches and misconduct in connection with a promised investment by Jupai into Ninespot.  This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.

2.      Ninespot, backed by several high-profile investors and strategic partners, was preparing to launch its promising live-video platform in the U.S. and Asia when it entered into contractual relationships with each of the Defendants.

3.      Those contractual relationships each related to a promised $18 million[1] investment that Jupai was to make in Ninespot in exchange for certain shares of the Company.

4.      After months of negotiations, delays, and assurances that the promised investment was forthcoming, each of the Defendants breached not only its contractual obligations to Ninespot but also the covenant of good faith and fair dealing implied in those agreements by law, as described herein.

5.      Defendant Puji—a trusted business collaborator with Ninespot—went even further, breaching its fiduciary duty by repeatedly deceiving Ninespot, undermining Ninespot's interests, and intentionally interfering with Ninespot's relationship with a prospective acquisition target by spreading lies about the Company's status.

---

[1]     All references to dollars in this Complaint refer to United States dollars unless otherwise stated.

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

6.    Moreover, the Defendants repeatedly misrepresented to Ninespot that the money to fund the promised investment had been raised and could be transferred to Ninespot.  But when Jupai evidently decided not to invest in Ninespot after all, the Defendants changed their story, claiming instead that Chinese government restrictions on outbound investments prevented them from upholding their bargains.  Upon information and belief, however, these excuses were just an artifice concocted to avoid the Defendants' contractual obligations.

7.    Ninespot relied on the Defendants' representations to its detriment by waiting through repeated delays, biding its time to launch its product in an ever-more-crowded market, foregoing critical personnel hires, not seeking other investments, and giving concessions intended to address Defendants' feigned concerns about outbound-capital restrictions.  Ultimately, Defendants strung Ninespot along for so long that Ninespot missed its opportunity to successfully launch its product and saw its business essentially destroyed by Defendants' deceit.

## PARTIES

8.    Ninespot is a Delaware corporation with its principal place of business in Mission Viejo, California.

9.    Jupai is a limited liability company incorporated under the laws of the Cayman Islands, with its principal place of business in Shanghai, China.

10.    Puji is a British Virgin Islands limited company with its principal place of business in Hong Kong.

11.    Puji Jupai is a Cayman Islands corporation with its principal place of business in Hong Kong.

## JURISDICTION

12.    This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00 in value, exclusive of interest and costs, and there is complete diversity of citizenship

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

between Plaintiff Ninespot and Defendants Jupai, Puji, and Puji Jupai (together, "Defendants").

13.     Each of the Defendants has purposely availed itself of the laws of California by negotiating and contracting with a California-based entity; agreeing to purchase securities from a California-based entity; expressly aiming fraudulent conduct at a California-based entity; breaching duties owed to a California-based entity; making misstatements and misrepresentations to a California-based entity within California; and/or conducting business within California.

14.     Exercise of personal jurisdiction over each of the Defendants is proper under California Code of Civil Procedure § 410.10, made applicable by Federal Rule of Civil Procedure 4(k)(1).

## VENUE

15.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Central District of California because a substantial part of the events or omissions giving rise to the claims occurred within this District, and because the Defendants are not resident in the United States.

## FACTUAL ALLEGATIONS

### *Ninespot and its Live-Video Platform*

16.     Ninespot is the creator of a livestream and online video platform (the "Platform") that connects celebrity content creators to their audiences and allows those content creators to execute multiple business models next to their own content.

17.     Ninespot is supported by a formidable roster of strategic investors and partners, including the world's largest global digital ad agency, Publicis.Sapient; a top talent-management company; Draper Triangle Ventures (Draper Venture Network); and several prominent high-net-worth individuals.

### *Puji Contracts with Ninespot to Help Ninespot Launch its Platform in China*

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

18.     On or about April 27, 2015, Ninespot's Chief Executive Officer and Chairman, Brian Costello, met with Gordon Chu, Vice President at Puji, in Publicis.Sapient's office in Santa Monica, California, to discuss the possibility of a collaboration between Ninespot and Puji.

19.     Over the next several months, Mr. Chu and Mr. Costello stayed in touch and exchanged information about their respective companies.  After Ninespot completed a Series A investment and established an exciting partnership with a top talent-management firm, Mr. Costello and Mr. Chu agreed to meet again on or about November 18, 2015.

20.     At their November 18, 2015 meeting, Mr. Costello and Mr. Chu again discussed the prospect of collaborating to assist Ninespot in entering the Asian market with its Platform and raising a Series B round of funding.  Mr. Chu indicated that Puji worked with a number of Asian tycoons and that he thought several of them would be interested in investing in Ninespot.  He also conveyed that he was particularly impressed by the prominent partnerships that Ninespot had established and thought that its partners' prestigious backgrounds and associations would be received favorably by Asian investors.

21.     In December 2015 and January 2016, Mr. Costello shared information about Ninespot with Mr. Chu and gave him access to electronic files that included detailed Company information.

22.     Mr. Chu suggested that Mr. Costello meet with the Chairman and principal owner of Puji, Andrew Hall.  He described Mr. Hall as a prominent Asian businessman who was well-connected to tycoon families in Asia, as well as to key U.S. executives, and who founded Puji to create investment opportunities for those families.

23.     On or about January 11, 2016, Mr. Costello met with Mr. Hall and Mr. Chu in Century City, Los Angeles, California, to further discuss the collaboration

4822-5562-5039.7

1  between Ninespot and Puji, including the prospect of Puji helping Ninespot to

2  establish strategic partnerships in Asia similar to the ones that Ninespot had already

3  established in the U.S.

4        24.    Thereafter, between the end of January and May 2016, Ninespot and

5  Puji commenced a collaborative relationship while negotiating the terms by which

6  Puji would help Ninespot to launch the Platform, establish strategic relationships in

7  Asia, and secure investment capital.

8        25.    On or about March 16, 2016, Mr. Costello sent Mr. Chu a first draft of

9  a Business Collaboration Agreement ("BCA") between Ninespot and Puji, which

10  was later executed on or about May 31, 2016.  A true and correct copy of the BCA

11  is attached hereto as Exhibit A.

12        26.    Pursuant to the BCA, Puji agreed to collaborate with Ninespot to adapt

13  the Platform for use in the Chinese market and to advise and assist Ninespot in its

14  efforts to expand the Platform into China, among other things, in exchange for

15  certain equity compensation from Ninespot as set forth in the BCA.

16        *Puji's Affiliate and Jupai Launch a Joint Venture to Invest in*
        *Companies in China and the U.S.*
17

18        27.    On or about April 25, 2016, Puji Capital, a Puji affiliate, announced

19  the launch of a new joint venture with Jupai, a Chinese wealth-management firm

20  traded on the New York Stock Exchange.  The joint venture was to be focused on

21  strategic investments in high-growth sector companies in Greater China and the

22  United States.

23        28.    The Puji Capital/Jupai joint venture also announced that its first

24  strategic investment was into Wanda Pictures, the film arm of Chinese

25  multinational conglomerate Dalian Wanda Group ("Wanda").  In a press release

26  announcing the Wanda investment, Mr. Zhu Junjie, co-president of Jupai, described

27  the joint venture as a "cornerstone" in Jupai's commitment to providing its clients

28

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

1   with domestic and global investment opportunities and stated that it was "only the
2   start of more global investments."

3       29.     On or about April 25, 2016, Mr. Chu forwarded Mr. Costello a *Variety*
4   article describing the Wanda Pictures transaction.  Mr. Chu informed Mr. Costello
5   that Puji Capital had a longstanding relationship with the Wanda Group and had
6   facilitated the joint venture's investment.  According to Mr. Chu, Jupai's high-net-
7   worth clients and some of Puji's other relationships accounted for $500 million of
8   the $2.4 billion Wanda Pictures placement.  Mr. Chu also represented to Mr.
9   Costello that Puji would be doing many more deals with Jupai going forward, and
10  in fact had several other deals pending.

11  ***Ninespot and Jupai, Through Puji, Negotiate Jupai's Investment Into Ninespot***

12      30.     In June 2016, Mr. Chu told Mr. Costello that a number of Puji's
13  business partners were interested in establishing a relationship with and investing in
14  Ninespot.  In particular, Mr. Chu said, Jupai was especially interested in investing
15  in the Company.

16      31.     According to Mr. Chu, Puji's Mr. Hall had a close relationship with
17  Jupai's then-Chief Executive Officer and Co-Chairman of the Board, Tianxiang Hu.
18  Mr. Chu also explained that Puji had a burgeoning influence over Jupai in light of
19  the joint venture and earlier Wanda Pictures investment, and thus it was well-
20  positioned to facilitate an investment from Jupai into Ninespot.

21      32.     Mr. Chu counseled Mr. Costello that to receive an investment from
22  Jupai, Ninespot would need to engage a reputable U.S. investor and the deal would
23  need to be approved by Jupai's internal investment committee.  Mr. Chu told Mr.
24  Costello that Mr. Hu, Chair of Jupai's Board, would personally support navigating
25  the deal through the Jupai investment committee for approval to distribute to
26  Jupai's clients.

27

28

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

33.     According to Mr. Chu, Jupai would present the opportunity to invest in Ninespot to its clients along with a $150 million placement for the Wanda Group's offline-to-online ("O2O") or Internet finance business (the "Wanda Deal").  Mr. Chu explained to Mr. Costello in June 2016 that Jupai was raising money for the two investments in tandem and that the Ninespot portion of the funds would be raised in non-RMB dollars.

34.     As an example of Jupai's capacity to invest in U.S.–based companies, Mr. Chu e-mailed Mr. Costello a copy of the prospectus for U.S. film company Mandalay Endurance Media Ventures ("MEMV") on or about June 17, 2016.  Mr. Chu indicated that Jupai had committed to invest $10 million into MEMV despite the challenges of funding U.S. film companies out of China.  Mr. Chu presented the MEMV deal to Mr. Costello as proof that Jupai would have no trouble funding the Ninespot Series B investment, and periodically updated Mr. Costello on Jupai's progress in meeting its funding commitments to MEMV.  Puji Capital later announced the launch of Puji Films and its first investment into MEMV on or about August 17, 2017.

35.     Acting in reliance on Mr. Chu's representations on behalf of Puji and Jupai, Ninespot satisfied Jupai's requirement that Ninespot secure a U.S. investor by obtaining a commitment from Draper Triangle Ventures ("Draper")—an existing investor in Ninespot—to invest $2 million into Ninespot's Series B financing along with Jupai's $18 million investment.  Ninespot sent Mr. Chu the executed Draper term sheet, Draper commitment cover letter, and a Ninespot pro-forma capitalization table on or about June 20, 2016.

36.     During the summer of 2016, Ninespot and Jupai, through Puji, continued to negotiate the terms of, and prepare documents in connection with, Jupai's planned investment in Ninespot (the "Investment").

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

37.     In July 2016, Mr. Chu drafted a Memorandum of Understanding for Jupai in both English and Chinese to present to Jupai's internal investment committee.  Mr. Chu also prepared the placement documents highlighting Ninespot's prominent partners, which documents were to be circulated to Jupai's high-net-worth clients along with the Wanda Deal placement materials.

38.     Also in the summer of 2016, Jupai, through Puji, directed inquiries to Ninespot regarding the Company's valuation and other issues related to the Investments, to which Ninespot responded fully.

39.     On or about July 25, 2016, Mr. Chu sent Mr. Costello Puji's thorough valuation analysis of Ninespot, which was added to the PujiCapital Ninespot investment summary and translated to Chinese for submission to the Jupai investment committee and circulation to Jupai's high-net-worth clients.

40.     Puji and Jupai ultimately determined that Ninespot was undervalued at a valuation of $80 million.  Puji and Jupai presented that valuation not only to the Jupai investment committee but also to their own private clients.

41.     On or about September 28, 2016, Mr. Chu sent Mr. Costello a draft term sheet setting forth the terms by which Jupai would fund the Investment in Ninespot (the "Term Sheet").  Consistent with the parties' previous discussions, the Term Sheet identified Jupai as the investing entity.

42.     Preparations for the Investment continued in September and October 2016.  Mr. Chu informed Ninespot during that time that Jupai's internal investment committee had approved the Investment, but that the deal was delayed while Jupai negotiated one remaining term related to the Wanda Deal.

43.     On or about September 26, 2016, Mr. Chu informed Mr. Costello by text message that the Wanda Deal was the "main issue" accounting for the delay and that Jupai could close its deal with Ninespot within two or three weeks were it not for the ongoing negotiations concerning the Wanda Deal term.

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

44.     On or about September 29, 2016, Mr. Costello of Ninespot met with two representatives of Puji and Jupai in Century City, Los Angeles to discuss the Investment.  Puji was represented at the meeting by Mr. Chu and Mr. Hall, and Jupai was represented by product manager Denis Wang and another Jupai employee.

45.     Despite his earlier representation that the Ninespot Investment was only held up because of the Wanda Deal, Mr. Chu informed Mr. Costello on or about October 5, 2016, that the parties intended to get the deal done by the end of the year.

46.     Mr. Chu sent Mr. Costello an e-mail update on the status of the Jupai Investment on or about October 28, 2016.  Mr. Chu indicated that Jupai had "assured" Mr. Hall that Jupai wanted to proceed with the Investment and would make it "a priority."  Mr. Chu also stated that Jupai had been on the road that week to "raise the mother fund of capital for the Wanda project (which includes the investment into Ninespot)."

47.     Mr. Chu repeatedly assured Mr. Costello by text message on October 10, October 13, October 24, and again on October 27, 2017, that the terms of the Wanda Deal were being or had been resolved and that Jupai's Investment in Ninespot would proceed.

### Puji Interferes with Ninespot's Relationship with OurCam

48.     Meanwhile, during precisely the same time period that Puji was assuring Ninespot that the planned Investment by Jupai would move forward, its Chairman, Mr. Hall, made contrary representations to Jeffrey Ng, the Chief Executive Officer of a potential Ninespot acquisition target and strategic partner, OurCam, whom Puji had previously introduced to Mr. Costello.

49.     Following their initial meeting in Hong Kong, Mr. Costello and Mr. Ng conducted several telephone calls, entered into a non-disclosure agreement, and

4822-5562-5039.7

exchanged information concerning a potential acquisition of OurCam by Ninespot, or an investment by Ninespot into OurCam, once Ninespot closed its Series B funding round.

50.     On or about October 15, 2016, however, Mr. Hall told Mr. Ng by WeChat voice message that Jupai's deal with Ninespot was progressing slowly, that Ninespot no longer planned to launch the Platform in China, and that OurCam should "give up" on its contemplated business arrangement with Ninespot.

51.     Puji's representations to Mr. Ng directly contradicted the representations that it had made and was making to Ninespot at the time, and undermined Ninespot's business interests.

52.     Upon information and belief, Puji's interference in Ninespot's relationship with OurCam was a substantial factor in Ninespot's failure to consummate an acquisition of or investment in OurCam.

### Jupai and Ninespot Execute the Term Sheet and the Parties Prepare Long-Form Investment Documents

53.     The Investment finally seemed to be moving ahead in November 2016, when Ninepot learned that the deal had formally been approved by Jupai's investment committee and received the executed Term Sheet from Puji, which Jupai had stamped.

54.     Ninespot understood the stamped Term Sheet to represent a firm commitment from Jupai to fund the full $18 million Investment.  Indeed, Ninespot had already completed extensive diligence requested by both Puji and Jupai, and had been told by Puji that Jupai had already raised all of the required capital for the Investment from its high-net-worth clients in connection with the Wanda Deal.

55.     In the days that followed, however, Puji informed Ninespot of a further condition for closing the deal with Jupai: the allocation of additional shares of Ninespot to Puji and Jupai in exchange for their foregoing fees on the Wanda Deal.

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

1  Mr. Chu told Mr. Costello that Wanda was paying a 15% one-time annual dividend
2  on the Wanda Deal, guaranteed at the corporate level.  Mr. Chu communicated that
3  Wanda and Jupai were splitting fees on the deal and that Mr. Hall of Puji and Mr.
4  Hu of Jupai were willing to forego some of those fees in return for Jupai's clients
5  also investing in Ninespot.

6       56.    Ninespot thus agreed to structure this additional equity into the deal
7  and was later told that the shares should be assigned to Probanca Advisory Limited
8  ("Probanca"), a British Virgin Islands corporation, to be allocated to Puji and Jupai.
9  This arrangement was memorialized in a Business Collaboration Agreement
10 between Ninespot and Probanca that was ultimately attached to the long-form
11 Investment documents but never executed by the parties.

12      57.    Mr. Chu sent Mr. Costello a draft of a long-form term sheet on or
13 about December 1, 2016, which he had prepared to assist Jupai personnel in
14 understanding the terms of the Ninespot Investment.  Puji also translated the long-
15 form term sheet into Chinese for Jupai.

16      58.    On or about December 5, 2016, Mr. Costello sent Mr. Chu drafts of all
17 Series B documents, including a Stock Purchase Agreement memorializing the
18 terms of the Investment and certain other documentation related to the deal with
19 Jupai.  Those documents had already been approved by Ninespot's board and other
20 investors, and by Draper's counsel; all that was needed to close the deal was
21 approval from Jupai.

22      59.    Over the ensuing weeks, Ninespot continued to work with Puji to
23 finalize the long-form documents and prepare to close the deal with Jupai prior to
24 December 31, 2016.  During this time, Puji continued to represent that Jupai—
25 through a designated entity—would fund the entire $18 million Investment once the
26 long-form documents were finalized and approved and the deal closed.

27

28

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

60.     On or about December 8, 2016, and again on or about December 16, 2016, Mr. Chu emphasized to Mr. Costello that Jupai wanted to ensure that would be able to transfer its Ninespot Investment between entities if it was able to find a more efficient tax structure for the Investment.

61.     Mr. Chu related to Mr. Costello via text message on or about December 20, 2016, that the long-form documents were acceptable to Puji, and that the only remaining issue was for Jupai to designate the entity through which it would fulfill the $18 million Investment and appoint a director.

62.     On or about December 21, 2016, Puji Capital announced an investment into U.S.–based gaming company aXiomatic.  aXiomatic later disclosed in a 2017 SEC Form D that the investment referenced in Puji's press release was for $16.5 million.  aXiomatic has the same principal owners as the MEMV investment that Mr. Chu had cited in June 2016 as an example of Jupai's ability to fund a $10 million investment.  Puji Director Alex Szeto was quoted in the aXiomatic release saying that "Puji Capital will continue to invest and act as that 'bridge' between China and Hollywood for all facets of media and entertainment."

63.     Despite efforts to facilitate a year-end closing, Mr. Chu did not inform Ninespot until January 6, 2017 that Jupai's designated investing entity would be Shanghai Jupeng Asset Management, Co., Ltd., located in Shanghai, and its director would be Jupai executive Denis Wang.

64.     But still the deal seemed to stall.  On or about January 25, 2017, Mr. Chu e-mailed Mr. Costello with an update on the transaction, including five questions that Jupai had raised and which Puji had "already addressed with Jupai's legal team."  Mr. Chu's January 25, 2017 e-mail also showed that Oreans Yuan, Puji's Chief Financial Officer, had sent the deal documents for signature to Jinchang (Augusto) Wang, an attorney at Jupai, on January 12, 2017.

4822-5562-5039.7

65.     In response to Mr. Costello's concerns about the repeated delays in closing the deal, Mr. Chu assured him in the January 25, 2017 e-mail that there was "no indication of any issues or problems" with Jupai executing the documents and finalizing the terms of the Investment.  Although Mr. Chu anticipated a further delay on account of the forthcoming Chinese New Year holiday, he indicated that there was no cause for concern because the deal was "still under [Jupai's] normal timing and process."

### Puji's and Jupai's Repeated Delays in the Closing the Investment Deal Limit Ninespot's Business Operations and Worry its Investors and Partners

66.     By early February 2017, however, Jupai still had not executed the long-form documents and Ninespot was becoming anxious about the status of the Investment.  Ninespot was primed to launch its Platform but was hamstrung by the repeated delays in closing the deal and its need for investment capital.  Its investors and partners were growing concerned.

67.     On or about February 9, 2017—nearly a month and a half after Ninespot had expected the deal to close at the end of 2016—Mr. Chu e-mailed Mr. Costello a new list of due-diligence requests from Jupai.  The requests listed Jinchang Wang and Tianxiang Hu of Jupai as the main contacts on the transaction. Despite his concerns about the delay, Mr. Costello worked with Mr. Chu and Kimberly Zheng at Puji to respond to Jupai's latest due-diligence requests and provided all required documents to Puji on or about February 13, 2017.

68.     By mid-February 2017, Mr. Costello and Ninespot's investors and partners had become increasingly nervous that Ninespot might squander its opportunity to launch the Platform while waiting for the promised Investment from Jupai.  Mr. Costello thus again sought assurance from Mr. Chu that Jupai had raised the funds for the Investment and would be able to transfer them to Ninespot, as the parties had agreed.

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

69.    In an e-mail dated on or about February 17, 2017, Mr. Chu again represented that Jupai had raised money for its Investment in Ninespot alongside its fundraising efforts to fund the Wanda Deal.

70.    According to Mr. Chu, funds raised for both the Ninespot Investment and the Wanda Deal had been placed in a master special-purpose vehicle held by Jupai.  Mr. Chu stated in his February 17, 2017 e-mail that the funds for Ninespot would have to be moved into a separate special-purpose vehicle and a separate bank account so that the funds could be repatriated to U.S. Dollars.  Although Mr. Chu repeatedly acknowledged to Mr. Costello the logistical challenges of funding the Investment, he never indicated that such challenges might prove insurmountable or otherwise jeopardize the Investment.

71.    In fact, on or about February 19, 2017, Mr. Chu stated in an e-mail to Mr. Costello that restrictions on outbound foreign investments by the State Administration of Foreign Exchange ("SAFE") rendered such investments "problematic" but "not impossible."

72.    Mr. Chu's February 19, 2017 e-mail further represented that Jupai would wait until there was a "a clear path for the [I]nvestment" before executing the long-form documents.

73.    Mr. Chu encouraged Mr. Costello to "feel free to forward" his February 19, 2017 e-mail to Ninespot's "shareholders / partners for their reference" to communicate the status of the Investment.

74.    Ninespot again acted in reliance on Puji's representations and assurances that the Investment would be forthcoming and continued to bide its time to launch the Platform and hold off on hiring essential personnel to support its operations.

### Ninespot Accommodates Jupai's Purported Concern About Outbound Capital Restrictions by Agreeing to Restructure the Investment

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

75.     As the weeks wore on, Mr. Costello decided to seek assurance directly from Jupai and not through Puji that Jupai intended to fund the Investment, so that Ninespot would not be waiting in vain at a pivotal moment in the Company's growth.

76.     Thus, on or about March 3, 2017, Mr. Costello shared with Mr. Chu a draft communication to Jupai in which Mr. Costello emphasized that Ninespot's opportunity to successfully launch its product was on hold awaiting Jupai's Investment and sought confirmation of his understanding that the monies for the Investment had in fact been raised in parallel with the Wanda Deal.  Mr. Costello's draft also specifically inquired of Jupai whether the Investment was being delayed due to concerns about restrictions imposed by the Chinese government on the flow of outbound capital.

77.     Mr. Chu proposed revisions to Mr. Costello's draft later that day and advised him: "A definite no on mentioning the Wanda O2O or assum[ing] you know their reasons of getting monies out of China."  Mr. Chu thus cautioned Mr. Costello against revealing to Jupai the very information that Mr. Chu and Puji had repeatedly conveyed about the status of the Investment.

78.     Mr. Costello and Mr. Chu ultimately agreed on a version of the e-mail to be sent directly to Jupai, which version Mr. Chu translated and transmitted. Jupai's attorney, Jinchang Wang, responded to Mr. Costello by e-mail on March 14, 2017, copying Zhu Junjie, Denis Wang, and Mr. Chu.  Mr. Wang stated that Jupai was "preparing [its] RMB currency investment fund" but that "the one gating issue is figuring the most efficient and effective way to get the investment out of China to the US."  Accordingly, Mr. Wang represented that Jupai would "structur[e] the flow of RMB funds through Puji and Puji will set up domestic and overseas structure[s] to realize the capital outflow and complete [Jupai's] investment in Ninespot."

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

79.    Mr. Wang's e-mail further proposed a payment schedule by which Jupai would fund the Investment over the course of eleven months.

80.    Mr. Costello again worked with Mr. Chu on a response to Jupai's request to modify the Investment documents to reflect the proposed tranches.  In the course of crafting a response, Mr. Chu stated in an e-mail to Mr. Costello dated March 14, 2017 that the shares allocated to Probanca should be issued on a pro-rata basis as Jupai funded the Investment.  Mr. Chu also indicated to Mr. Costello that the details of the share allocation would be discussed between Mr. Hall of Puji and Mr. Hu of Jupai, but should "not necessarily . . . be discussed below" with lower-level Jupai employees working on the Investment deal.

81.    To accommodate Jupai's purported concerns about capital outflow, Ninespot agreed on or about March 15, 2017 to structure the Investment in tranches.

82.    But Mr. Costello emphasized the importance of receiving an initial investment tranche to meet Ninespot's capital needs associated with the Platform launch and to avoid impeding the operations of the Company, and requested that Jupai make its best efforts to fund the full $18 million investment over a nine-month horizon "so that it will not drastically change how we operate the business[,] especially in the first year."

83.    Ninespot and Jupai thus agreed that Jupai would fund an initial tranche of $1.5 million upon the execution of the long-form deal documents, and the balance of the Investment in accordance with an agreed-upon funding schedule.

84.    Ninespot and Jupai specifically agreed to fix the first tranche of the Investment at $1.5 million with the understanding that Jupai would be able to fund that amount notwithstanding any restrictions on outbound foreign investments.

4822-5562-5039.7

85.     Indeed, Puji represented to Ninespot that Jupai had made arrangements to transfer similar amounts in order to fund other of its investments in entities based in the United States.

***The Stock Purchase Agreement is Finally Executed, but Immediately Breached***

86.     After months of delays, Puji and Jupai were finally ready to proceed with the Investment in April 2017.

87.     On or about April 5, 2017, Mr. Costello met with Mr. Chu and Mr. Hall of Puji in Century City, Los Angeles, to discuss finalizing the Investment.  Mr. Chu and Mr. Hall told Mr. Costello that Ninespot could expect to receive the executed deal documents soon and that Mr. Hall was working with Jupai to increase the initial investment tranche to as much as $5 million because they realized that the inflow of capital was crucial for Ninespot's business.

88.     In preparation for closing, Jupai, through Mr. Yuan and Mr. Chu, designated Puji Jupai as the entity through which it would fund the Investment.

89.     On or about April 10, 2017, however, Jupai, through Puji, requested one final change to the parties' stock purchase agreement: the insertion of a clause disclaiming liability if Jupai was unable to purchase the full amount of its total share commitment within the prescribed twelve-month period.

90.     According to Mr. Chu, Jupai requested the clause "to cover their asses if [the Chinese] government for foreign exchange gets more strict"—in other words, to protect Jupai in the event that *future* restrictions on the flow of outbound capital delayed the timeframe for funding the Investment.

91.     Ninespot, anxious to finalize the deal and finally advance its business, agreed to this concession with the understanding that this clause would have no impact on the funding of the first tranche of the Investment.

92.     Ninespot and Jupai's designated offshore entity, Puji Jupai, thus executed the Ninespot, Inc. Series B Preferred Stock Purchase Agreement ("SPA")

4822-5562-5039.7

1    on or about April 17, 2017.  A true and correct copy of the SPA is attached hereto

2    as Exhibit B.

3        93.    The SPA set forth the terms of the Investment, including the number of

4    shares to be sold by Ninespot and purchased by each of Puji Jupai and Draper for

5    their total investments of $18 million and $2 million, respectively.

6        94.    The SPA also specifically provided for payment by Puji Jupai of the

7    first $1.5 million tranche of the Investment on the date of the "Initial Closing",

8    which the SPA defines as the date of "the physical or electronic exchange among

9    the parties and their counsel of all documents and deliverables required under this

10   Agreement."

11       95.    At the same time, Ninespot and Puji Jupai executed a Side Letter

12   Agreement that set forth the timing and value of the tranches by which Jupai,

13   through Puji Jupai, had agreed to fund the Investment.  A true and correct copy of

14   the Side Letter Agreement is attached hereto as Exhibit C.

15       96.    Pursuant to the Side Letter Agreement, "Jupai and its Affiliates" were

16   to use their "best efforts to ensure that" the first $1.5 million tranche of the

17   Investment was funded in April 2017, and the subsequent four tranches were to be

18   funded in four equal payments by January 2018.

19       97.    With the SPA executed and the tranches agreed upon via the Side

20   Letter Agreement, Ninespot waited for the first tranche of the Investment to be

21   funded as promised upon the Initial Closing.  But the first tranche of funding never

22   came; in fact, no portion of the Investment did.

23       98.    Instead, on or about May 13, 2017, Mr. Chu stated in an e-mail to Mr.

24   Costello that "Jupai's first attempt at wiring money via SAFE was rejected at the

25   bank," and that "Jupai [was] not hopeful for the SAFE route to get monies out" of

26   China.  Mr. Chu represented that both Puji and Jupai were exploring other options

27   for funding the Investment.

28

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

99.    Upon information and belief, however, Jupai never attempted to wire any portion of its promised Investment to Ninespot.

100.   Mr. Costello requested a status update from Mr. Chu on behalf of one of Ninespot's investors on or about June 2, 2017.  He received no response.

101.   Days later, on or about June 5, 2017, Mr. Costello met with Mr. Chu and Mr. Hall in Los Angeles to discuss the status of the Investment.  Instead of focusing on facilitating Jupai's promised Investment through Puji Jupai, however, Mr. Chu and Mr. Hall sought to persuade Mr. Costello that another investment group might invest in Ninespot instead.

102.   The meeting with Mr. Chu and Mr. Hall did little to ease Mr. Costello's concerns that Jupai's Investment was in jeopardy.  Mr. Costello inquired again about the status of the Investment on or about June 8, 2017, but did not receive adequate assurances that the first tranche of the Investment was immediately forthcoming.  Mr. Costello's e-mail inquiry also requested documentation from Puji that Jupai had in fact attempted to transfer the first tranche of the Investment funds, documentation related to how Ninespot investors' and partners' names were used to raise funds, and proof that the funds remained intact.  Mr. Costello received no response.

103.   Ninespot recognized the importance of capitalizing on a dynamic market for live-video platforms but knew that it needed the agreed-upon Investment to launch its product.  Thus, in a final effort to progress the Investment, Mr. Costello sent Mr. Chu and Mr. Hall a draft of a demand letter addressed to Puji Jupai as the contracting party under the SPA on or about June 13, 2017.

104.   Mr. Chu and Mr. Hall contacted Mr. Costello later that day via telephone to further discuss the demand letter.  Mr. Hall advised Mr. Costello to address the demand letter directly to Jupai as the entity that was in fact funding the Investment, and encouraged Ninespot to include in the letter language related to

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

1   possible regulatory consequences, which Mr. Hall thought would get Jupai's

2   attention.

3        105.   On or about June 14, 2017, Ninespot, through its counsel, sent the

4   demand letter to Jupai seeking assurance that Jupai had attempted in good faith to

5   fund the first tranche of the Investment and that the funds earmarked for the

6   Investment remained available.  A true and correct copy of the June 14, 2017 letter

7   is attached as Exhibit D.

8        106.   Also on or about June 14, 2017, Mr. Costello sent an e-mail to Mr.

9   Hall and Mr. Chu to inform them that Ninespot considered Jupai's failure to fulfill

10   its Investment obligations to be a serious matter and believed that the circumstances

11   of such nonperformance were suggestive of unfair and deceptive business practices.

12        107.   Ninespot received a response to its demand letter to Jupai on or about

13   June 26, 2018.  The response came from Mr. Yuan of Puji, who claimed to be

14   responding in his capacity as Director of Puji Jupai to the letter Ninespot had

15   addressed to Jupai, and was also sent to Messrs. Hall and Chu of Puji and to

16   Augusto Wang, Denis Wang, and Zhu Junjie of Jupai, among others.  A true and

17   correct copy of Mr. Yuan's June 26, 2018 communication is attached as Exhibit E.

18        108.   Mr. Yuan's response, purportedly on behalf of Puji Jupai, contained a

19   number of baffling statements and outright misrepresentations, including but not

20   limited to the following:

21             a.   After more than a year of negotiating with Puji and Jupai to

22                  coordinate Jupai's promised investment in Ninespot and the express

23                  understanding that Puji Jupai was intended merely as a vehicle to

24                  facilitate the flow of outbound capital from Jupai to Ninespot, Mr.

25                  Yuan denied that Jupai had any contractual obligation to Ninespot

26                  and ordered that "[a]ll future communications should be directed to

27                  Puji Jupai only."

28

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

b. Despite the fact that Mr. Chu, on behalf of Puji and Jupai, had expressly represented to Ninespot that Jupai had raised investment capital in Ninespot's name, and notwithstanding the multiple documents that had been prepared for the purpose of Jupai raising capital for the Ninespot Investment, Mr. Yuan categorically denied that Jupai or Puji Jupai had ever done so.

c. Mr. Yuan claimed that the Chinese government's restrictions on outbound capital investments were tightened in December 2016, after the execution of the Term Sheet in November 2016, and thus "constitute an unforeseeable and uncontrollable event of force majeure"—apparently ignoring that the SPA was executed later, in April 2017.

d. Mr. Yuan conspicuously did not claim that Jupai or Puji Jupai had in fact attempted to fund the first tranche of the Investment, as Mr. Chu had previously represented in May 2017, but instead protested that Puji Jupai had attempted various "mitigation efforts" to "attempt to deliver the investment through other means." According to Mr. Yuan, these efforts had "either concluded to a non-viable solution to overcome [the alleged] force majeure event and/or does not satisfy corporate compliance and/or [are] in current on-going conversations."  Mr. Yuan did not describe or offer proof of these alleged "mitigation efforts."

109.   Mr. Yuan concluded by stating that "[i]n light of the nature and tone" of Ninespot's letter, among other things, "it is our decision that Puji Jupai Asset Management will cease any and all further efforts for investment into Ninespot and confirm termination of the [SPA]."

4822-5562-5039.7

110.   Mr. Yuan closed his letter with a bizarre threat: "We demand that Ninespot immediately cease and desist from any further investment demands and/or requests as well as all any [*sic*] irrational behavior against Puji Jupai, Jupai and their shareholders."

### *Puji and Jupai Misrepresented Jupai's Ability and Willingness to Fund the Investment*

111.   Upon information and belief, Puji and Jupai's misrepresentations to Ninespot about Jupai's ability and willingness to fund the Investment were intended to deceive Ninespot and obscure their unfair business practices.

112.   As set forth herein, Puji and Jupai both represented, among other things, that Jupai had raised the monies necessary to fund its promised Investment into Ninespot and that Chinese restrictions on outbound investments were the only impediment to funding the Investment.

113.   At their urging, however, Ninespot had agreed to structure the Investment in tranches to address that very issue—a concession that compromised Ninespot's need for capital at a critical stage of the Company's growth in order to allay Puji and Jupai's feigned concerns.

114.   Moreover, upon information and belief, Jupai has worked with Puji and/or its affiliates to fund at least two significant investments in U.S.–based companies during exactly the same time period that it has represented to Ninespot that it was unable to transfer investment monies out of China.

115.   Further upon information and belief, Jupai diverted monies that it had raised for its Investment into Ninespot to fund these or other investments—all while representing to Ninespot that such monies remained available for the Investment into Ninespot.

4822-5562-5039.7

116.   Indeed, upon information and belief, the alleged restrictions on outbound investments have had little impact on Jupai's business and did not thwart the Ninespot Investment.

117.   In addition to funding other outbound investments while breaching its promise and making misrepresentations to Ninespot, Jupai also engaged in other significant activities in or focused on the United States during the same time period, including establishing real estate leases and staffing offices in the U.S. for its affiliates, paying a substantial dividend to shareholders in the U.S., and making representations on quarterly earnings calls and in interviews with the media about Jupai's expansion plans into the U.S., including setting up global overseas funds.

### Defendants' Breaches and Wrongful Conduct Have Devastated Ninespot's Business

118.   The breaches, misrepresentations, and bad faith of the Defendants described herein have effectively destroyed Ninespot's business.

119.   As a direct result of the Defendants' breaches and wrongful acts, Ninespot has suffered damages including but not limited to:

  a. losing a $2 million investment in the Company from Draper, which was to be funded according the same terms as the Investment under the SPA;

  b. foregoing other investments in the Company, consistent with the SPA;

  c. losing unique and valuable strategic partnerships;

  d. not hiring essential personnel while awaiting promised investment capital;

  e. losing the opportunity to acquire OurCam and enter the Asian market;

  f. missing a critical opportunity to timely launch the Platform; and

4822-5562-5039.7

g.      ultimately ceasing operations due to lack of capital at a critical stage in the Company's growth.

120.   In fact, the breaches and wrongful acts described herein have rendered Ninespot essentially worthless.

## COUNT ONE
## BREACH OF CONTRACT
### (Against Puji)

121.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 120 of this Complaint as if fully set forth herein.

122.   By entering into the BCA with Ninespot, Puji promised, among other things, to collaborate with Ninespot and to facilitate Ninespot's adaptation and launch of its Platform in China in exchange for certain equity compensation.

123.   Ninespot performed its obligations under the BCA or was prepared to perform them in due course.

124.   Puji breached the BCA by, among other things, failing to facilitate the Investment and/or the launch of the Platform in China, and in fact, actively undermining Ninespot's interests in these regards.

125.   Ninespot has been harmed by Puji's breach and has suffered damages in an amount to be determined at trial.

## COUNT TWO
## BREACH OF CONTRACT
### (Against Puji Jupai)

126.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 125 of this Complaint as if fully set forth herein.

127.   Pursuant to the SPA, Puji Jupai agreed to purchase, and Ninespot agreed to sell, certain shares of Series B Preferred Stock and certain total shares with an aggregate purchase price of approximately $18 million.

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

128.   Ninespot was prepared to issue the agreed-upon shares to Puji Jupai as the prescribed tranches were funded, on the terms set forth in the SPA and the accompanying Side Letter Agreement, and otherwise performed its obligations under the SPA.

129.   Puji Jupai breached the SPA by failing or refusing to purchase the shares it agreed to purchase pursuant to the SPA.

130.   Ninespot has been harmed by Puji Jupai's breach and has suffered damages in an amount to be determined at trial.

## COUNT THREE

## BREACH OF CONTRACT

### (Against Jupai)

131.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 130 of this Complaint as if fully set forth herein.

132.   Jupai promised Ninespot to fund the Investment into the Company pursuant to agreed-upon terms, in exchange for certain consideration.

133.   The basic terms of the agreement between Jupai and Ninespot were set forth in detail in a Term Sheet executed by both parties and stamped by Jupai.

134.   Ninespot performed, or was prepared to perform in due course, its agreed-upon obligations to Jupai.

135.   Jupai breached its agreement with Ninespot by failing or refusing to fund its promised Investment into the Company and by failing to negotiate a definitive agreement with Ninespot in good faith that properly reflected its agreed-upon obligation to fund the Investment.

136.   Ninespot has been harmed by Jupai's breach and has suffered damages in an amount to be determined at trial.

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

## COUNT FOUR

### BREACH OF THE IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING

### (Against All Defendants)

137.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 136 of this Complaint as if fully set forth herein.

138.   Each of the Defendants entered into separate agreements with Ninespot, as set forth herein.

139.   Under each of those agreements, each of the Defendants owed Ninespot the duty of good faith and fair dealing implied in the agreements by law.

140.   Ninespot performed, or was excused from performing, its obligations under each such contract.

141.   The Defendants breached the covenant of good faith and fair dealing by, among other things, making statements to Ninespot that were materially false, and otherwise frustrating Ninespot's right to receive the benefits of its agreements with Defendants.

142.   Each of the Defendants thus unfairly interfered with Ninespot's contractual rights.

143.   Ninespot has been harmed by Defendants' breaches and has suffered damages in an amount to be determined at trial.

## COUNT FIVE

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

### (Against Puji and Jupai)

144.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 143 of this Complaint as if fully set forth herein.

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

145.   Both Puji and Jupai were aware of the SPA between Ninespot and Puji Jupai.

146.   Puji's and Jupai's conduct, as set forth herein, prevented Puji Jupai from performing its obligations under the SPA.

147.   Puji and Jupai either intended to prevent Puji Jupai's performance of its obligations under the SPA or knew that Puji Jupai would likely be unable or unwilling to perform its obligations as a result of their conduct, as set forth herein.

148.   Ninespot has been harmed by Puji's and Jupai's intentional interference with Ninespot's contract with Puji Jupai and has suffered damages in an amount to be determined a trial.

## COUNT SIX

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
### (Against Puji)

149.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 148 of this Complaint as if fully set forth herein.

150.   Puji was aware that Ninespot enjoyed a business relationship with OurCam that likely would have resulted in future economic benefit to Ninespot in the form of a strategic partnership and/or potential acquisition.

151.   By virtue of Puji's special relationship with Ninespot as described herein, Puji owed Ninespot a duty of care not to interfere with Ninespot's prospective economic relationships.

152.   Despite Puji's duty to Ninespot and knowledge of Ninespot's prospective relationship with OurCam, Mr. Hall, acting on behalf of Puji, wrongfully and unlawfully misrepresented to OurCam that Ninespot was moving slowly toward the launch of its Platform and no longer had plans to introduce its

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

product in China, and suggested to OurCam that it "give up" on its prospective business relationship with Ninespot.

153.   Puji knew or should have known that such wrongful conduct would disrupt Ninespot's business relationship with OurCam, and either intended such consequence or knew that such consequence was substantially certain to occur.

154.   Ninespot has been harmed by its inability to consummate a strategic partnership and/or acquisition with OurCam, and Puji's wrongful conduct was a substantial factor in causing that harm.

155.   As a result of Puji's interference, Ninespot has suffered damages in an amount to be determined at trial.

**COUNT SEVEN**

**BREACH OF FIDUCIARY DUTY**

**(Against Puji)**

156.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 155 of this Complaint as if fully set forth herein.

157.   By virtue of their relationship under the BCA, Ninespot relied on Puji for advice and guidance on key business matters and reposed its confidence in Puji's integrity and good faith.

158.   As a result of such relationship, Puji owed Ninespot a fiduciary duty to act with the utmost good faith for Ninespot's benefit.

159.   Puji's wrongful conduct, as described herein, was contrary to Ninespot's interests and constituted a breach or breaches of the fiduciary duty that Puji owed to Ninespot.

160.   Ninespot has been harmed as a result of Puji's breaches and has suffered damages in an amount to be determined at trial.

**COUNT EIGHT**

**INTENTIONAL MISREPRESENTATION**

4822-5562-5039.7

**(Against All Defendants)**

161.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 160 of this Complaint as if fully set forth herein.

162.  Each of the Defendants made false representations to Ninespot, as described herein, concerning, among other things, the status of the Investment into Ninespot and Jupai's and/or Puji Jupai's willingness and ability to fund the Investment.

163.  The Defendants knew those representations to be false or made them recklessly without regard for their truth, with the intent that Ninespot would rely on them.

164.  Ninespot reasonably relied on the Defendants' representations to its detriment, and as a result suffered harms including, without limitation, the harms alleged in paragraph 119 of this Complaint.  Defendants' intentional misrepresentations were a substantial factor in causing such harms.

165.  Ninespot has suffered damages in an amount to be determined at trial.

## COUNT NINE

### VIOLATION OF THE DELAWARE DECEPTIVE TRADE PRACTICES ACT, 6 Del. C. § 2531 *et seq.*

**(Against All Defendants)**

166.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 165 of this Complaint as if fully set forth herein.

167.  Puji and Jupai engaged in deceptive trade practices by, among other things, representing that Jupai and/or Puji Jupai was willing and able to fund the promised Investment into Ninespot.

168.  The Defendants also engaged in deceptive trade practices because their conduct—including their misrepresentations, denials, and threats in response to

4822-5562-5039.7

1   Ninespot's inquiries following their various breaches—created a likelihood of

2   confusion and misunderstanding about the Investment.

3        169.  Ninespot has been damaged by these willful deceptive trade practices,

4   and therefore is entitled to relief for its actual losses, treble damages, and attorneys'

5   fees pursuant to 6 Del. C. §§ 2533(b) & (c).

6   **PRAYER FOR RELIEF**

7        WHEREFORE, Plaintiff Ninespot respectfully requests the following relief:

8        (i)     An award of compensatory damages in an amount to be determined at

9   trial;

10       (ii)    Pursuant to 6 Del. C. § 2533(c), three times the amount of the actual

11  damages proved;

12       (iii)   An award of costs and attorneys' fees pursuant to 6 Del. C. § 2533(b);

13       (iv)   An award of pre-judgment and post-judgment interest; and

14       (v)    That a judgment be entered in favor of Plaintiff against all Defendants

15  granting such other further relief as this Court deems just and proper.

16  **JURY DEMAND**

17       Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a

18  trial by jury in the above-captioned action of all issues so triable.

19

20

21

22

23

24

25

26

27

28

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:          October 2, 2017

Respectfully submitted,

**NIXON PEABODY LLP**

_____

Jessica N. Walker
(State Bar No. 275398)
jwalker@nixonpeabody.com
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Tel: (213) 629-6000
Fax: (855) 780-9262

Jonathan Sablone
jsablone@nixonpeabody.com
Kacey Houston Walker
kwalker@nixonpeabody.com
100 Summer Street
Boston, MA  02110-2131
Tel: (617) 345-1342
Fax: (866) 947-1729
_Pro Hac Vice Applications_
_Forthcoming_

Attorneys for Plaintiff Ninespot, Inc.

COMPLAINT
CASE NO. 8:17-CV-01719

4822-5562-5039.7